# EXHIBIT A

**April 6, 2020     Third Amended Complaint and Demand for Jury Trial**

ERIC G. FERRER                        6828
LAW OFFICE OF ERIC G. FERRER
P.O. Box 1218
Haiku, Hawai'i  96807
Telephone:  (808) 250-6125
eric@ericferrerlaw.com

REBECCA LEIBOWITZ                     10890
DANIEL J. O'MEARA                     9890
LEGAL AID SOCIETY OF HAWAI'I
924 Bethel Street
Honolulu, HI 96813
Telephone:  (808) 536-4302
Facsimile:  (808) 527-8088
rebecca.leibowitz@legalaidhawaii.org
dan.omeara@legalaidhawaii.org

Attorneys for Defendants
ANA MANUMALEUNA,
ULYSSES MANUMALEUNA, AND
F.M., A MINOR CHILD, BY AND
THROUGH HIS GUARDIAN
ANA MANUMALEUNA

**Electronically Filed
FIRST CIRCUIT
1CC191001371
06-APR-2020
04:24 PM**

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| ANA MANUMALEUNA, ULYSSES MANUMALEUNA, AND F.M., A MINOR CHILD, BY AND THROUGH HIS GUARDIAN ANA MANUMALEUNA,<br><br>          Plaintiffs,<br>     vs.<br><br>KAHUKU VILLAGE ASSOCIATION, INC., CITY AND COUNTY OF HONOLULU, DEBORAH A. SARSONA, THOMAS MCBRIDE, BOARD OF DIRECTORS OF KAHUKU VILLAGE ASSOCIATION, INC., JIMMY LEONARDI, NOREEN CRISTOBAL, LESLIE LLANOS, JIM CAMIT, BENJAMIN BALIGAD, AND KO'OLAU WELLNESS CENTER LLC,<br><br>          Defendants. | CIVIL NO. 1CC19-1-1371<br>(Other Civil Action)<br><br><br><br>THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL |

## THIRD  AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiffs ANA MANUMALEUNA ("Ana"),ULYSSES ("Ulysses") MANUMALEUNA and F.M., A MINOR CHILD, BY AND THROUGH HIS GUARDIAN ANA MANUMALEUNA ("Child" or "son") (collectively, "Plaintiff), by and through their undersigned attorneys, and for their Complaint against Defendants KAHUKU VILLAGE ASSOCIATION, INC. ("KVA"), CITY AND COUNTY OF HONOLULU ("City and County"), DEBORAH A. SARSONA ("Sarsona"), THOMAS MCBRIDE,("McBride") the BOARD OF DIRECTORS OF KAHUKU VILLAGE ASSOCIATION, INC. (the "Board"), JIMMY LEONARDI ("Leonardi"), NOREEN CRISTOBAL ("Cristobal"), LESLIE LLANOS ("Llanos"), JIM CAMIT ("Camit"), BENJAMIN BALIGAD ("Baligad") and KOʻOLAU WELLNESS CENTER LLC ("Wellness Center") (collectively, the "Defendants") (Leonardi, Cristobal, Llanos, Camit, and Baligad are collectively the "Board Members") , allege and aver as follows:

### PARTIES

1.      Plaintiffs are residents of the State of Hawaii and rented a property from KVA located at House #92 Main Camp, Kahuku, HI 96731 (the "Property") pursuant to a Permit Agreement executed on July 16, 2014 (the "Lease").  The Lease was executed by Ana and KVA.

2.      Child is the minor child of Ana and Ulysses born in 2009 and is disabled within the meaning of Hawaii Revised Statutes ("HRS") § 515-2.

3.      KVA is a nonprofit corporation registered with the State of Hawaii Department of Commerce and Consumer Affairs ("DCCA").

4.     The City and County is the fee owner of the Property which is part of Parcel #560020110000 in the property records of the Real Property Assessment Division of the City and County, a 21+ acre parcel which is classified for residential use (the "Parcel").

5.     KVA manages the Property and the Parcel under a month to month Lease with the City and County ("City and County Lease"), which provides, in part, that KVA will comply with all laws of any governmental authorities which are applicable.

6.     The City and County is a municipal corporation whose principal place of business is in Honolulu, Hawai'i.

7.     Deborah Sarsona is an individual resident of the State of Hawaii, Island of Oahu who is also the manager of KVA.

8.     The Board is the governing body of the Kahuku Village Association, Inc.

9.     Upon information and belief, Jimmy Leonardi is an individual resident of the State of Hawaii, Island of Oahu and a member of the Board.

10.    Upon information and belief, Noreen Cristobal is an individual resident of the State of Hawaii, Island of Oahu and a member of the Board.

11.    Upon information and belief, Leslie Llano is an individual resident of the State of Hawaii, Island of Oahu and a member of the Board.

12.    Upon information and belief, Jim Camit is an individual resident of the State of Hawaii, Island of Oahu and a member of the Board.

13.    Upon information and belief, Benjamin Baligad is an individual resident of the State of Hawaii, Island of Oahu and a member of the Board.

14.    McBride is an individual resident of the State of Hawaii, Island of Oahu operating a business immediately adjacent to the Property and within the boundaries of the Parcel. Such

3

business is a gym facility located at 114 Main Camp, in a building that was formerly a church (the "Gym").

15.     On information and belief, McBride is from Canada and is not a descendant of plantation workers in Hawaii.

16.     The Wellness Center is a domestic limited liability company registered with the DCCA.

17.     The Defendants and each of them are all doing business in the City and County of Honolulu, State of Hawaii. Defendants, and each of them, have participated as members of the wrongful and improper acts or acted with or in furtherance of them, or aided or assisted in carrying out their purposes as alleged in this complaint, and have performed acts and made statements in furtherance of the violations and conspiracy.  Defendants, and each of them, individually, are sued as participants, co-conspirators and/or aiders and abettors in the wrongful and improper acts, plans, schemes, and transactions that are the subject of this lawsuit, including under Hawaii Revised Statutes ("HRS") § 515-16.

18.     Defendants are "person(s)" engaging in real property transactions within the meaning of HRS § 515-2 and Hawaii Administrative Rules § 12-46-302.

## JURISDICTION AND VENUE

19.     This Complaint is filed in part (a) pursuant to common law doctrines proscribing tortious conduct; (b) pursuant to HRS Chapter 480; and (e) under HRS Chapter 515.

20.     Venue is proper in this Court, where the Property is located, the averred torts, deceptive conduct, and discrimination occurred and where Plaintiffs filed their Complaint.

## FACTS

21.     KVA is a nonprofit corporation whose stated purpose is, according to its filing with the DCCA, to combat deterioration in the existing Koʻolauloa region by formulating plans for the renewal and rehabilitation of the community and to develop low and moderate income housing.

22.     Part of this mission of KVA was addressed through providing descendants of plantation workers with the opportunity to live in former plantation houses.

23.     Plaintiff Ana's grandfather was a former plantation worker and Ana lived at a plantation house in Kahuku Village when she was a child.

24.     There were at least five proposed phases of development of Kahuku Village.

25.     Phases I, II, and III were developed and houses sold with the assistance of Community Development Block Grants ("CDBG") from the U.S. Department of Housing and Urban Development ("HUD") to the City and County.

26.     The Property is located in Phase IV of the development of Kahuku Village ("Phase IV").

27.     Phase IV had flooding in the 1990's and thereafter became designated as being in a flood zone after the flood maps were redrawn by the Federal Emergency Management Agency ("FEMA") subsequent to the flooding.

28.     As a result of the FEMA designation as being in a flood zone, development of Phase IV of Kahuku Village has stymied the City and County efforts to complete development of Kahuku Village.

29.     CDBG funds were used by the City and County for portions of the acquisition of Kahuku Village.

30.     The development of KVA was intended to provide additional low and moderate income housing, with an expectation that certain residents would be able to purchase some of the homes, and if not purchase, be entitled to relocation assistance if they did have to move.

31.     There are a few hundred thousand dollars of CDBG funds held by the City and County for the Kahuku Village project.

32.     According to HUD, the City and County must maintain the Kahuku Village project, including Phase IV in CDBG compliance for at least 5-years after the final expenditure of the funds.

33.     Even though the City and County Lease for the Parcel is month-to-month, there is nothing imminent that will change in the development of Phase IV that would require termination of the City and County Lease.   The designation of Phase IV as being contained in a flood zone has changed and delayed any development of Phase IV.

34.     Insofar as the City and County Lease is month-to-month, the Lease of the Property is, necessarily, month-to-month.

35.     There was no expectation that Plaintiffs (or anyone else in Phase IV) were at risk of any imminent eviction. The month-to-month nature of both the City and County Lease on the Parcel and the Lease on the Property was due to the uncertainty of how to develop Phase IV, not because there was an imminent need to evict anyone.

36.     Plaintiffs had been living at the Property since August 2014.

37.     The Gym was adjacent to the Property since Plaintiffs moved in.

38.     On information and belief, the location of the Gym is on land which is zoned for residential, not business use.

39.     Usage of the Gym increased from the time that Plaintiffs moved in through 2019 when it was converted into a larger facility.  The noise and activity gradually became more intolerable to the Child.

40.     Since 2016, the usage of the Gym has resulted in noise from music and activity that would start as early as 5:00 a.m. and continue until after 9:00 p.m.  As a result, the noise and activity became more and more intolerable for Child.

41.     The Gym became affiliated with the Wellness Center in or around 2018 or early 2019.

42.     Child is disabled with autism and is sensitive to the noise and activity and the noise and activity of the Gym was interfering with his sleep which adversely affects his daily life activity preventing him from having an equal opportunity to the use and enjoyment of the Property.

43.     Plaintiffs interacted with Defendants McBride, the Wellness Center, Sarsona, and KVA, Camit and Leonardi to request a reasonable accommodation for the Child's disability due to the effect the noise, vibrations and loud music had on Plaintiffs' life activities, including sleep.

44.     It was represented to Ulyssess in April 2019 that Sarsona was consulting with Board members Llanos, Cristobal, Camit, and Leonardi with respect to negotiations regarding alternate housing at 427 Walkerville to solve the problems raised by the Plaintiffs.

45.     The result of Plaintiffs efforts to obtain a reasonable accommodation for their son was that an eviction action was commenced by KVA and the Plaintiffs had to leave the Property.

46.     McBride knew that Plaintiffs had a contractual right to possession of the Property.

7

47.     McBride knowingly, intentionally, and actually interfered with the Plaintiff's contractual right to the quiet use and enjoyment of the Property.

48.     On information and belief, McBride had the expectation of occupying the Property either as a residence, office, or both, after the Plaintiffs vacated the Property,

49.     It was in the self-interest of the Wellness Center and McBride to force the Plaintiffs out of the Property.

50.     The Wellness Center and McBride's interference with Plaintiffs contractual relation with KVA was improper and caused damage.

51.     In or around early 2017, Ms. Manumaleuna and the then operator of the Gym, and Debbie Sarsona of KVA, met to discuss Plaintiff Ana Manumaleuna's concerns regarding the noise and activity at the Gym and its effects on her Child.

52.     Defendant Leonardi was in attendance at this meeting. During the meeting he spoke in favor of the gym stating that his daughter took classes there when she came to visit.

53.     Defendant Camit was in attendance at this meeting. During the meeting he acted as if he supported Ms. Manumaleuna and her family.

54.     A few months after that meeting, and in recognition of the noise that was coming from the Gym, the Gym built a wall downstairs on the side of the Gym that faced the Property. The wall helped with the noise since, at the time, the Gym's programs were only operating on the lower level of the Gym building.

55.     Some of the instructors and managers at the Gym were mindful of the noise and took measures to reduce noise at the Gym. However, Defendant McBride who began instructing classes at the Gym around 2016, made no attempt to keep the noise down.

56.     Defendant McBride was openly antagonistic toward Plaintiffs' son's disability and ignored Plaintiffs' attempts to mitigate the impacts of the Gym's activity on their son's condition.

57.     In 2018 McBride approached Defendant Sarsona about his plans to expand the gym.

58.     Sarsona, KVA and each of its Board members wanted to appease the gym and allow its expansion because they wanted to continue to receive revenue from the gym which was a non-conforming use of the land.

59.     Sarsona then spoke with McBride and an agent of the Wellness Center in which she requested that they assist with relocating Plaintiff's to 427 Walkerville.

60.     On information and belief the KVA Board members, Defendants Cristobal, Llanos, Camit, Baligad and Leonardi all voted to allow the gym to expand its operations in exchange for accepting it's's offer to pay for repairs to 427 Walkerville in order to accommodate Plaintiffs need for a home not subject to loud noises from early morning until late at night. Plaintiffs were not consulted regarding this arrangement prior to the Board members acceptance. At the time of this Board action, Plaintiffs had not requested to be moved from their residence to accommodate the continued noisy use of the Wellness Center.

61.     On or around 2016 and on or around 2018, Ulysses Manumaleuna reached out to the City and County of Honolulu's Department of Planning & Permitting to report that the Gym was operating a business in a residential zoned area.

62.     In 2018, McBride began construction to expand the Gym to the second floor.

63.     In or around January of 2019, the Wellness Center and McBride began conducting classes on the second floor, after renovations of the second floor in 2018, and the noise coming from the Gym and its participants substantially increased.

64.     Plaintiffs sought further assistance with the accommodation for their son's disability from the Wellness Center McBride, Sarsona, and KVA.

65.     In a meeting in or around January 2019, Sarsona and the Wellness Center and McBride discussed with Plaintiff, Ana Manumaleuna, that McBride had begun improvements to another house at Kahuku Villages in the Walkerville area where she and her family could relocate.

66.     On information and belief, McBride insinuated themselves into the rental housing process by actively participating in making renovations to House #427 Walkerville ("Alternate Housing"), including but not limited to, having a new roof put on the Alternate Housing, doing some painting, and otherwise coordinating with KVA and Sarsona to expedite the exit of Plaintiffs from the Property.

67.     In or around January of 2019, Plaintiffs requested to view the house but were told that they could not see it until repairs were completed.

68.     On or around early April 2019, the KVA, through Sarsona, told Plaintiffs they could move to the Alternate Housing in Phase IV.

69.     In or around April 2019, Plaintiffs were allowed to view the property with the Alternate Housing.

70.     The Alternate Housing was not safe and it was in disrepair when Sarsona showed it to Plaintiffs.

71.     Plaintiffs asked if it would be fixed and repaired.  Among other concerns, the front deck entrance was about to fall off.

72.     Sarsona said it had a new roof put on by McBride and maybe cabinets would be installed.  Sarsona did not say if KVA was paying McBride for the upgrades to the Alternate Housing.

73.     Sarsona told Plaintiffs they would have to accept the Alternate Housing in its current condition since KVA and McBride would do nothing more to fix the Alternate Housing. At the time that Sarsona made this statement, she and each of the individual Board members of KVA, knew that the Alternate Housing was not safe or habitable. Thereafter, KVA did, in fact, cease making repairs on the Alternate Housing and it continued to be unsafe and uninhabitable.

74.     After January of 2019, Plaintiffs also noticed that in addition to increased noise coming from the Gym, McBride appeared to be instructing participants in early morning classes at the Gym to run directly past their home, a practice that was very disruptive to Plaintiffs and their son and had been discontinued by prior Gym managers.

75.     The actions and lack of actions and lack of mitigation by KVA, Sarsona, the Wellness Center, and McBride interfered with the use and enjoyment of the Property and interfered with Plaintiffs disabled sons' right to an accommodation for his disability so that he had equal opportunity to the same sort of housing as everyone else in the Parcel.

76.     The actions and lack of actions and lack of mitigation by KVA, Sarsona, the Wellness Center, and McBride substantially and unreasonably prevented Plaintiffs and their son from enjoying normal daily life activities.

77.     KVA, Sarsona, the Wellness Center, and McBride knew of the challenges Plaintiffs were facing to help their disabled son deal with the loud noise and activity of the Gym.

78.     On or around April 4, 2019, Plaintiff Ulyssess Manumaleuna contacted Sarsona in frustration because the Wellness Center and McBride had been operating the Gym until 10:30 at night on the night of April 3, 2019. During that meeting he told Sarsona that they could not accept an unsafe home to move into.

79.     No other accommodation was offered to help Plaintiffs to ameliorate the interference with the use and normal enjoyment of the Property resulting from the adverse impact of the loud noise and activity of the Gym on the ability of Plaintiffs' son to function normally. Approximately one week later, rather than work with Plaintiffs and provide a reasonable accommodation, instead, and in retaliation for Plaintiffs' reasonable requests, Defendants commenced efforts to evict Plaintiffs by having KVA's attorney send Plaintiff's a letter dated April 9, 2019, informing them that KVA was terminating their tenancy and Plaintiffs had to vacate the Property as of May 31, 2019 (the "45-Day Notice").

80.     The 45-Day Notice told the Plaintiffs they were to relocate to the Alternate Housing by May 31, 2019, "as agreed." This statement was false because Plaintiffs had not agreed to relocate to the dangerous and dilapidated Alternate Housing. Moreover, at the time KVA caused the 45-Day Notice to be sent, KVA knew that the Alternate Housing was unsafe and uninhabitable and would continue to be so by May 31, 2019, because it had ceased work on the residence to make it safe and habitable for Plaintiffs.

81.     Plaintiffs could not and did not relocate to the Alternate Housing since it was still unsafe as of May 31, 2019 and the Alternate Housing was in disrepair.

82.     Contrary to the representations of Sarsona and KVA that no more work was going to be done to the Alternate Housing and, it was only available to Plaintiffs as is for their occupancy, the Alternate Housing was still being refurbished as of August 12, 2019, for the occupancy of others, the day after Plaintiffs vacated the Property.

83.     KVA and Sarsona were not being candid, honest, or acting in good faith to offer Plaintiffs the Alternate Housing to accommodate the needs of their disabled son.

84.     On or around April 10, 2019, after receiving the 45-Day Notice, Plaintiff Ulysses approached Defendant Baligad to inquire about the 45-Day Notice. Defendant Baligad told Ulysses that he should "not open that can of worms" and that his family should move to the Walkerville house.

85.     On or around April 10, 2019, after receiving the 45-Day Notice, Plaintiff Ana approached Defendant Camit to inquire about the 45-Day Notice. Defendant Camit told Ana that her family should not move from their home at Main Camp and that KVA could not evict them.

86.     On April 9, 2019, in the 45-Day Notice, KVA offered housing that was not actually safe or in good repair as a solution to the noise from the gym.

87.     Plaintiffs had overheard gym staff say that they could not wait until that complaining family was out of the Property so they could use it. The Gym is only about ten feet from the windows of the Property.

88.     On information and belief, McBride had an arrangement to take possession of the Property for personal use once it was vacated by Plaintiffs.

89.     On information and belief, McBride has not been on the KVA waitlist for a residence and he does not qualify as a descendant of a plantation worker.

13

90.     KVA filed a Complaint for Summary Possession of the Property on Monday, June 3, 2019, in the District Court of the First Circuit, Koʻolauloa Division in 1RC19-1-3803 (the "Complaint"). This was the first day possible to file such an action after the 45-Day Notice period.

91.     The Complaint was extremely upsetting to Plaintiffs since they were only trying to obtain an accommodation for the needs of their disabled son.

92.     The 45-Day Notice was defective because, among other things, it offered a Hobson's Choice providing no meaningful, good faith alternative to eviction.

93.     The 45-Day Notice was also deceptive, coercive and pretextual, functioning as a means to avoid its obligation to engage in an interactive process and offer Plaintiffs a reasonable accommodation. Instead Defendants sought to rid itself of its legal obligation by evicting the Plaintiffs.

94.     KVA intended Plaintiffs to rely on the false and misleading 45-Day Notice as a means of evicting them.

95.     On information and belief, KVA, Sarsona, the Board, Board Members, the Wellness Center and McBride's interests in getting the Plaintiffs to leave their home conflicted with the interests of the Plaintiffs to quiet enjoyment of the Property and their right to be free of discrimination against their son on the basis of disability and without retaliation.

96.     On or around July 8, 2019, Ms. Manumaleuna spoke again with Sarsona to ask if KVA and the Board would allow them to stay. She reluctantly told Sarsona that she would accept the Walkerville house in whatever condition it was in because she did not want her family to be homeless.

97.     On information and belief, the Defendants Leonardi, Camit, Baligad, Cristobal, and Llanos **each voted** in favor of continuing with the eviction of the Plaintiffs. By doing so they individually participated in the denial of a reasonable accommodation for F.M. and engaged in retaliatory activity against the Plaintiffs. This action creates direct liability under H.R.S. 515-3 and H.R.S. § 515-16. This action also otherwise made them individually liable because it was grossly negligent and done for the unlawful purpose of retaliatory eviction, avoidance of city rules, for personal gain and for an improper financial purpose, namely, a desire to continue to receive revenue from the gym which was a non-conforming use of the land.

98.     On information and belief, the Board and Defendants Cristobal, Llanos, Camit, Baligad and Leonardi agreed to rescind the offer of the Alternate Housing in contravention of the rights of Plaintiffs to be free from discrimination, which discrimination was adversely affecting Plaintiffs and their son's daily life activity preventing him from having an equal opportunity to the use and enjoyment of the Property.

99.     On information and belief, the Board and Defendants Cristobal, Llanos, Camit, Baligad and Leonardi refused to enter into a new rental agreement with Plaintiffs because Plaintiffs had demanded safe and habitable housing and each of these Defendants refused to make the Alternate Housing safe and habitable.

100.    On information and belief, the Board and Board Members of Kahuku Village Association, Defendants Cristobal, Llanos, Camit, Baligad, and Leonardi refused to approve Ulysses Mamumaleuna's association membership even though he had paid his ten dollars of dues.

101.    On information and belief, the Board and Defendants Cristobal, Llanos, Camit, Baligad and Leonardi, individually, participated as members of the wrongful and improper acts alleged herein, or acted with or in furtherance of them, or aided or assisted in carrying out their purposes, and performed acts and made statements in furtherance of the violations and conspiracy by, among other things, (1)  allowing the daughter of the president of the Board, Defendant Leonardi to currently occupy the Alternate Housing after it was made safe and habitable by said Defendants, rather than allow the Plaintiffs to occupy the Alternate Housing, and, by (2) allowing McBride, an unintended beneficiary of the development and non-descendent of any plantation workers of the community, to take possession of the Property in place of and instead of Plaintiffs.

102.    Upon information and belief, the Board held community meetings and did not invite Plaintiffs to participate.

103.    With all other alternatives now foreclosed, on July 11, 2019, Plaintiffs signed a Charge of Real Property Transaction Discrimination (the "Charge") with the Hawaii Civil Rights Commission ("HCRC").

104.    The Charge notes that Plaintiffs' son was sensitive to noise because of his disability and that Defendants were aware of this sensitivity.

105.    The activity at the Gym was disturbing the Plaintiffs son's sleep with loud music, yelling, people running to their home, loud sounds and vibrations from weights hitting the ground.

106.    On information and belief, on July 11, 2019 (the day before the July 12, 2019 return hearing on the Complaint), KVA and Sarsona were made aware that the Charge had been filed with HCRC.

107.     KVA, and Sarsona denied Plaintiffs' reasonable accommodation request and the Defendants and instead retaliated against, and collectively interfered with, Plaintiffs for exercising their fair housing rights.

108.     At the July 12, 2019 return hearing on the Complaint Plaintiffs met with the attorney for KVA who blamed Plaintiffs for the eviction telling Plaintiffs that they should have acted differently and should have accepted the Alternate Housing. He stated that if the case goes forward an eviction will be on their record.

109.     KVA's attorney told Plaintiffs they could still take the Alternate Housing. Plaintiffs informed him that KVA had told them the day before, July 11, that Plaintiffs could no longer have the Alternate Housing.

110.     KVA's attorney was not aware that the Alternate Housing was no longer available. He called KVA to confirm, and did confirm its lack of availability.

111.     KVA's attorney was completely unaware of the condition of the Alternate Housing as to whether it was safe or in good repair on May 31, 2019.

112.     Plaintiffs told the attorney for KVA that the Alternate Housing was in disrepair on or about May 31, 2019.

113.     KVA's counsel told Plaintiffs they should have just taken the Alternate Housing and that KVA would have worked something out. This is contrary to the actual facts because KVA refused to provide the Alternative Housing in a habitable and safe condition. Moreover, The 45-Day Notice states nothing about a requirement of KVA to 'work with' Plaintiffs to make the Alternate Housing habitable within the time frame of the 45-day Notice. Even as of the date of the return hearing on July 12, 2019, the Alternate Housing was still unsafe and uninhabitable. Indeed, as of at least September 23, 2019, KVA continued to work on the

Alternate Housing to make it safe and habitable. Plaintiffs never agreed to move from the Property to an uninhabitable unsafe residence. This was the condition of the Alternate Housing throughout the eviction process and continued as of the date Plaintiffs were forced to vacate the Property. Throughout this period Defendants and each of them knew that it was wrong, inappropriate and unlawful to force Plaintiffs to move into an unsafe and uninhabitable residence and that their conduct caused extreme emotional distress to the Plaintiffs.

114.    KVA and Sarsona misrepresented the options to the Plaintiff and offered Plaintiffs no choice but to be evicted.

115.    Plaintiffs' felt tremendous pressure to work out an exit with KVA since Plaintiffs knew the Alternate Housing was no longer available (and still in disrepair) and Plaintiffs were very concerned about the coercive threat from KVA's attorney that the eviction would be on their record and the impact that could have on their finding new housing.

116.    KVA's attorney even recommended that Plaintiffs drop the HCRC Charge, but offered nothing in exchange for dropping the Charge.  KVA's attorney said the HCRC process would be stressful.  He said he had not yet been retained to defend the Charge as of July 12, 2019.

117.    Plaintiffs were not represented by an attorney at this time.

118.    Plaintiffs reluctantly agreed to vacate the Property by August 11, 2019, since they felt they had no other alternative.

119.    Defendants retaliated and discriminated against Plaintiffs in the following ways:

   a.   By failing to reasonably address and/or ameliorate the noise and disruption to their disabled son's sleep as early as 2014 and ongoing;

b.  By failing to reasonably engage in an interactive process and provide Plaintiffs with a reasonable accommodation to lessen the noise and disruption of the Gym;

c.  By the putative offer of substandard housing in the form of the Alternate Housing to Plaintiffs in the first week of April 2019 to;

d.  By telling Plaintiffs that they had to accept the Alternative Housing in its state of disrepair at the early April 2019 meeting with Sarsona to;

e.  By failure of the Defendants to take action to mitigate the noise and allowing the Gym to operate on property that is zoned residential;

f.  By instructing their attorney to send to Plaintiffs a defective 45-Day Notice on April 9, 2019, in an attempt to force Plaintiffs to accept substandard housing instead of the Property, which continued to be in such condition as of the last day of the 45 day notice, May 31, 2019;

g.  By filing a complaint to evict Plaintiff instead of engaging, in good faith, in an interactive process with an offer of a reasonable accommodation;

h.  By coercively pressuring Plaintiffs to agree to exit the Property at the return hearing on June 12, 2019, to avoid an eviction on their record;

i.  By authorizing and/or allowing their attorney to make an offer of the Alternate Housing, which in fact had been withdrawn;

j.  By authorizing and/or allowing their attorney to suggest that the eviction was the fault of the Plaintiffs and that they should drop the HCRC charge;

k.  By using all of the above tactics to force Plaintiffs to vacate the Property and allow McBride to take possession of the Property;

120.    The City and County of Honolulu has vicarious liability for the actions of KVA under 24 CFR § 100.7(b). Additionally, the City and County of Honolulu was aware of the noise complaints made by Plaintiffs and their complaint that the Wellness Center and McBride, with the permission of KVA, was operating a business in a residentially zoned area. Yet, it did nothing to ameliorate the nuisance created by McBride's activity.

## COUNT ONE
### Wrongful and Retaliatory Eviction as to KVA and the Board

121.    All prior allegations and averments in this Complaint above are incorporated herein by reference.

122.    KVA made false demands and representations to Plaintiffs to deceptively force them to vacate the Property.

123.    The 45-Day Notice was defective and not sufficient to provide strict compliance with the notice provisions required under Hawaii law.

124.    KVA's attempt to evict the Plaintiffs was contrary to State law.

125.    KVA knew such statements and demands were false, particularly with respect to the Alternate Housing being a viable alternative to move to on May 31, 2019

126.    KVA intended Plaintiffs to rely upon the false and deceptive statements to get them to move and avoid its obligations to provide Plaintiffs with a reasonable accommodation and otherwise retaliate against them for making such a request.

127.    Plaintiffs did rely upon KVA's false and deceptive demands and did move to protect their family.

128.    KVA's false, misleading, and deceptive statements and demands were material and damaging.

129.    The result of KVA's actions was to wrongfully evict the Plaintiffs.

130.    KVA and the Board's actions also violated H.R.S. § 521-74 because the 45-day notice was issued in retaliation to the Plaintiff's having raised concerns about the health and safety in their housing and prospective housing.

## COUNT TWO
### Tortious Interference with Contractual Relations as to the Wellness Center and McBride

131.    All prior allegations and averments in this Complaint above are incorporated by reference as if fully stated here.

132.    Plaintiffs had a valid contract for possession for the Property.

133.    The Wellness Center and McBride knew that Plaintiffs had a contract for possession of the Property.

134.    The Wellness Center and McBride intended to and did actually interfere with Plaintiffs rights under their contract on the Property.

135.    The Wellness Center and McBride's interference was improper and was intended for self-dealing to force Plaintiffs out of the Property.

136.    Plaintiffs were damaged by The Wellness Center and McBride's tortious interference with their contractual relation with KVA.

## COUNT THREE
### Unfair and Deceptive Acts and Practices as to KVA

137.    All prior allegations and averments in this Complaint above are incorporate by reference, as if fully set forth here.

138.    Plaintiffs are consumers within the meaning of HRS §480-2.

139.    Based upon the facts set forth above and incorporated herein, KVA engaged in unfair and deceptive acts and practices in violation of Chapter 480 of the Hawaii Revised Statutes, by, among other things,

a.   Making deceptive, false or misleading representations to Plaintiffs regarding the viability of being able to relocate to the Alternate Housing;

b.   Wrongfully evicting Plaintiffs to avoid its obligation to provide a reasonable accommodation to Plaintiffs as provided by law;

c.   Violating HRS§ 521-10, as Defendant acted in bad faith:

d.   Violating HRS§ 521-31(d), as the agreement to vacate was unconscionable and secured by deception and coercion;

e.   Violating HRS§ 521-74(a), as the eviction was retaliatory both with respect to Plaintiffs request for a reasonable accommodation and their request and their reasonable requests for repairs to the Alternate Housing.

f.   Wrongfully evicting Plaintiffs to allow McBride to take up residence in the Property for his own personal and business use.

140.   KVA was also deceptive, and unscrupulous by retaliating against Plaintiffs for trying to assert their fair housing rights to prevent KVA from discriminating against their son because of his disability.

141.   KVA's false, misleading, and deceptive statements and demands and 45-Day Notice were material to Plaintiffs.

142.   As a result of the KVA's unfair and deceptive actions, Plaintiffs suffered damages emotionally and financially as well as damage to their minor children.

**COUNT FOUR**
**Violations of Hawaii Revised Statutes Chapter 515 – Discrimination in Real Property Transactions and Related Hawaii Administrative Rules Subchapter 20 as to All Defendants**

143.   All prior allegations and averments in this Complaint above are incorporated herein by reference.

22

144.    Through Defendants' acts as described above, including the acts of their employees, agents, and/or representatives, Defendants violated HRS § 515-3(1), (3) and (9) by terminating Plaintiffs' tenancy based on their son's protected class and refusing to make a reasonable accommodation in rules, policies, practices, or services that would aid a disable person and subjecting Plaintiffs to unequal terms and conditions on the basis of a disability with respect to the terms, conditions, or privileges of a real estate transaction.

145.    Through Defendants' acts as described above, including the acts of their employees, agents, and/or representatives, Defendants further violated HRS § 515-16 by aiding, inciting, or coercing a person to engage in a discriminatory practice, and by retaliating, threatening, or discriminating against a person engaged in the enforcement of their rights under HRS Chapter 515, and otherwise intimidating or interfering with a person because of their protected class.

146.    Defendants' acts and conduct in violation of HRS Chapter 515, and related Hawaii Administrative Rules Subchapter 20, caused Plaintiff injury.

147.    Plaintiffs were damaged by Defendants discrimination.

148.    Defendants and each of them acted intentionally, willfully, wantonly, oppressively, with gross negligence and/or with such malice as to imply a spirit of mischief or criminal indifference to civil obligations and/or with willful misconduct and/or that entire want of care which would raise a presumption of conscious indifference to the consequences of their conduct.  They are each therefore liable to the Plaintiffs for punitive damages.

149.    Each of the individual defendants, Camit, Baligad, Cristobal, Llanos and Leonardi, participated in, authorized, and/or ratified the commission of civil rights and fair housing violations as above alleged.

23

150.    Additionally, Defendant Baligad acted in violation of H.R.S. § 515-16 by interfering with Plaintiffs rights under H.R.S. Chapter 515 when on or around April 10, 2019, he urged Ulysses Manumaleuna not to pursue his complaints against the gym and to move from #92 Maincamp to the inhabitable Walkerville house.

151.    Additionally, Defendant Camit knowingly acted in violation of H.R.S. §515-16, by interfering with Plaintiffs' rights under H.R.S. Chapter 515 by agreeing to and voting to evict Plaintiffs even after telling Plaintiff Ana that her family should not move from their home at Main Camp and that KVA could not evict them.

152.    Members of a board of directors can be held liable as individuals for their participation in board related activities for fair housing discrimination.

*United States v. Tropic Seas, Inc.,* 887 F.Supp. 1347, 1365 ("a corporation's officers and directors may be held individually liable for their failure to ensure the corporation's compliance.... This is so even where the individual director or officer did not actively participate in the alleged discrimination and did not subjectively intend to discriminate against the complainant.").

153.    As the owner of the property, the City and County is vicariously liable for the other Defendant's violations under HRS Chapter 515.

## COUNT FIVE
### Intentional Infliction of Emotional Distress

154.    All prior allegations and averments in this Complaint above are incorporated by reference, as if fully set forth here.

155.    Defendants' conduct was unreasonable, outrageous and was intended to cause and did cause the Plaintiffs severe emotional distress.

24

156. Defendants knew, or in the exercise of reasonable diligence, should have known that their conduct would cause illness and harm to the Plaintiffs.

157. As a direct, foreseeable and proximate result of Defendants' outrageous conduct as alleged herein, the Plaintiffs have suffered and will suffer damages, including emotional distress, in an amount to be proven at trial.

158. Defendants each acted intentionally, willfully, wantonly, oppressively, and/or with such malice as to imply a spirit of mischief or criminal indifference to civil obligation and/or with willful misconduct and/or that entire want of care which would raise a presumption of conscious indifference to the consequence of their conduct. They are each therefore liable to the Plaintiffs for punitive damages.

## DEMAND FOR JURY TRIAL

159. Pursuant to Hawaii Rules of Civil Procedure Rule 38(b), Plaintiff demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ANA MANUMALEUNA AND ULYSSES MANUMALEUNA, pray as follows:

A. For actual, compensatory, special and punitive damages to be determined at trial.

B. Damages for nuisance, wrongful eviction, and tortious interference with contractual relations to be determined at trial.

C. Damages under HRS Chapter 480.

D. Damages under HRS Chapter 515.

E. Damages under HRS Chapter 521-74.

F. For cost of suit, in an amount to be determined by the Court;

G.   For attorneys' fees, in an amount to be determined by the Court; and

H.   For such other and further relief as deemed just and proper by the Court.

DATED:  Kailua, Hawaii; April 6, 2020

/s/Rebecca Leibowitz
REBECCA LEIBOWITZ
DANIEL J. O'MEARA
ERIC G. FERRER
Attorneys for Defendants
ANA MANUMALEUNA,
ULYSSES MANUMALEUNA, AND
F.M., A MINOR CHILD, BY AND
THROUGH HIS GUARDIAN
ANA MANUMALEUNA